**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GLENDA ATKINS, CRYSTAL** | ) | |
| **AKRIDGE, DARPHELIA AKRIDGE,** | ) | |
| **DORIS GOODNER, AND CHICA** | ) | |
| **ALEXANDER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:13-00562** |
| | ) | **Judge Sharp** |
| **LQ MANAGEMENT, LLC D/B/A** | ) | |
| **LA QUINTA INN AND SUITES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this diversity case alleging employment discrimination in violation of the Tennessee

Human Rights Act ("THRA"), Tenn. Code. Ann. § 4-21-101 *et seq.*, the sole remaining claim is

whether any one or more of the Plaintiffs was subjected to a hostile work environment.[1]  The Court

held a bench trial on this issue from April 21-23, 2015, after which the parties were instructed to file

proposed findings and conclusion and allowed to file supplemental briefs, the last of which was filed

on July 29, 2015.

Having reviewed the parties' proposed findings and conclusions, their arguments, the record,

the exhibits received in evidence, and the testimony of the witnesses, after considering their interests

and demeanor, the Court enters the following Findings of Fact and Conclusions of Law in

accordance with Rule 52(a) of the Federal Rules of Civil Procedure.  Except where the Court

---

[1]  By Order and Memorandum filed August 26, 2014, the Court dismissed Plaintiffs' retaliation and constructive discharge claims.  Atkins v. LQ Management, LLC, 2014 WL 4232789 (M.D. Tenn. Aug. 26, 2014).

discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts it deems to be immaterial to the issue presented. Finally, to the extent that a finding of fact constitutes a conclusion of law, the Court so concludes; to the extent that a conclusion of law constitutes a finding of fact, the Court so finds.

## I. <u>FINDINGS OF FACT</u>

1. Plaintiffs Glenda Atkins, Crystal Akridge, Darphelia Akridge, Doris Goodner and Chica Alexander, all African-American females, are former employees in the housekeeping department at the La Quinta Inn and Suites in Franklin, Tennessee. At all relevant times, Jeff Campbell, a Caucasian male, was the General Manager of the property, while Michelle Armour, an African-American female, served as Assistant General Manager.

### A.

2. Ms. Atkins began working for Defendant LQ Management, LLC d/b/a La Quinta Inn and Suites[2] in 2008 as a housekeeper at the La Quinta Inn on Sidco Drive in Nashville, Tennessee. She had no supervisory responsibilities in that position. However, after approximately five years as a housekeeper, the General Manager of the property, Charles Livingston, asked Ms. Atkins if she had any interest in being the head housekeeper at the La Quinta Inn in Franklin, Tennessee. She responded in the affirmative.

3. Ms. Atkins met with Mr. Campbell, and was hired as the head housekeeper at the Franklin La Quinta in December 2011. This was a promotion and came with a raise.

4. As head housekeeper, Ms. Atkins checked to make sure all of the housekeepers had

---

[2] Defendant operates approximately 400 hotels nationwide.

reported for work. She assigned them the floors they would be on, the rooms they would clean, and prepared the paperwork regarding those assignments. Occasionally, Ms. Atkins also cleaned rooms.

5. Although Defendant asserts that Ms. Atkins had no authority to hire, fire or discipline employees on her own, the credible evidence shows otherwise. Ms. Atkins was told by Mr. Campbell that she would be responsible for hiring and, in fact, she was responsible for hiring each of the other four Plaintiffs in this action. She did so after receiving an application and interviewing them. More often than not, the new housekeeping employee would start the same day as the interview, or the next day. Ms. Atkins also fired at least two employees while she was head housekeeper.

6. Ms. Atkins credibly testified that Mr. Campbell made what she considered to be untoward and/or racist comments, statements and/or actions at least twice a week.[3] She testified these included:

(A) often using the word "monkey," and saying that the housekeepers looked like a bunch of monkeys when they were standing in the hallway;

(B) stating that President Obama did not know what race he was, and that he needed to go back to Africa;

(C) stating that he would love to hire a bunch of Latinos or Mexicans because they know how to work and African Americans do not;

(D) stating that he needed to get "some lighter color" in the hotel;

(E) talking about African Americans on welfare, and housekeepers living in the

---

[3] Ms. Atkins worked in close proximity to Mr. Campbell for five or six hours a day, spending much of her time in the area behind the front desk where Mr. Campbell had an office.

projects;

(F) saying that the first of the month was Mother's Day because that was when government benefits are paid;

(G) saying that housekeepers would not come to work on welfare day;

(H) observing that African American women wear weaves in their hair, Caucasian women do not, and stating that horses were missing hair because of hair weaves;

(I) telling the African-American employees to exit through the front of the hotel because "people were stealing"; and

(J) providing Caucasian housekeepers bottled water, but requiring African-American to drink from the water fountain.[4]

(Docket No. 81, Tr. Trans., Vol. I pp. 27-30).

7.  On several occasions, Ms. Armour was present when Mr. Campbell made comments about President Obama, including comments about the President not knowing his race and needing to go back to Africa.

8.  At one time or another, each of the Plaintiff's complained to Ms. Atkins about Mr. Campbell,[5] and, on several occasions, Ms. Atkins directly complained to Mr. Campbell about his comments. She told him the remarks were racist and that he could get in trouble for saying the things that he did. Mr. Campbell usually laughed and shrugged the complaints off, as if everything was a joke or "cute."

9.  Ms. Atkins was extremely proud that President Obama had been elected. She took

---

[4] Ms. Atkins provided the housekeepers with bottled water when Mr. Campbell was not present.

[5] Ms. Atkins testified that an employee would complain to her about Mr. Campbell "just about every day." (Id. at 38).

particular umbrage at Mr. Campbell's suggestion that the President should not have been elected and needed to go back to Africa, and she told Mr. Campbell as much.

10. At some point, Ms. Atkins learned from her co-workers that Mr. Campbell said he needed to "slap her black ass," after she had been issued a speeding ticket. Mr. Campbell admitted making a comment about smacking Ms. Atkins, but said he was only kidding.

11. Ms. Atkins also complained to Ms. Armour about Mr. Campbell. She met with Ms. Armour in a room at the hotel and told her Mr. Campbell's statements "w[ere] not right," that "he need[ed] to stop," and that the "girls" were offended by his statements about the President, and his remarks about welfare and hair weaves. (Id. at 35). Ms. Armour told Ms. Atkins that she would talk to Mr. Campbell.

12. In addition to complaining to both Mr. Campbell and Ms. Armour, Ms. Atkins called an 800 hotline number that had been set up by La Quinta Inns for discrimination complaints. The call went to voicemail and she left her name and number, but received no return call.

13. Mr. Campbell's comments had a negative emotional affect on Ms. Atkins. She dreaded going to work, did not like working around Mr. Campbell, and would often cry when she thought about the derogatory comments and statements that he made. As head housekeeper, Ms. Atkins wanted the "girls" to "look up to her," but felt Mr. Campbell demeaned her by telling other employees that he would "slap her black ass."

14. Ms. Atkins stepped down from the position of head housekeeper on Oct. 1, 2012,[6] but continued to work at the Franklin La Quinta as a housekeeper on a part-time basis at lesser pay.

15. Ms. Atkins now works for Vanderbilt University as a laboratory technician.

---

[6] Ms. Atkins was replaced as head housekeeper by Johna Lee, an African American female.

**B.**

16. Ms. Alexander learned from Ms. Goodner about a job opening at the Franklin La Quinta Inn.  She was interviewed at the hotel by Ms. Atkins, and began her employment as a housekeeper in June of 2012.[7]  She worked there for approximately seven months.

17.  In filling out her application for employment Ms. Alexander wrote,  "no" in response to the question of whether she had ever been convicted of a crime.  In fact, Ms. Alexander pled guilty to dealing cocaine in a school zone, for which she did 18 months in prison.  She was released on probation in 2010.  Ms. Alexander testified that she omitted her conviction because she really needed a job and was told by Ms. Goodner that the hotel did not conduct background checks.

18. Ms. Alexander was disciplined on one occasion by Ms. Atkins because she did not report (or reported late) to work.  She was not disciplined by Mr. Campbell.

19.  Ms. Alexander credibly testified that Mr. Campbell made racially insensitive or offensive remarks quite often ("like every other day"), and while she did not hear all of the comments, she was informed by her co-workers of other remarks.  She attributed the following statements and/or actions to Mr. Campbell which she found to be racially insensitive or offensive:

(A) When Ms. Alexander wore her hair in an "afro," Mr. Campbell stated that "only black people wear their hair like that";

(B) When President Obama was elected, Mr. Campbell said that the country should not have a black President and that he needed to go back to Africa where he came from;

---

[7]  At the time of her hire, there were five black and two white housekeepers (one of whom worked in the laundry).

(C) Mr. Campbell stated that young black women take off the first of the month because that is welfare day;

(D) When Ms. Alexander asked for a bottle of water one day, Mr. Campbell told her that was for the rich people in Franklin, and that the poor people in Nashville drink from the sewer water. Nevertheless, Mr. Campbell allowed the two Caucasian housekeepers to have bottled water;

(E) Mr. Campbell stated that "black girls live in the projects" yet "drive nice cars";

(F) Ms. Alexander was in the laundry room with Ms. Goodner when Mr. Campbell said that he would "slap [Ms. Atkins'] black ass";

(G) When Ms. C. Akridge passed her Certified Nursing Assistant ("CNA") test, Mr. Campbell stated that she must have copied off a white person;

(H) Mr. Campbell stated that the housekeepers should not bring chitlins to the Christmas party because "only black people eat chitlins . . . [w]hite people don't eat chitlins."[8]

(Id. at 77 & 79-80).

20. Ms. Alexander asked Mr. Campbell about what he meant regarding President Obama, and told him that his racist comments hurt her feelings. Generally, Mr. Campbell just "laughed about a lot of things," and would "laugh stuff off or smile about it." (Id. at 79 & 82).

21. Ms. Alexander claims to have tried the 1-800 number but was unsuccessful. She complained to both Ms. Armour and Ms. Alexander about Mr. Campbell's conduct, but was never given a form to complete which would document her allegations.

---

[8] Ms. Alexander testified that Ms. Armour was present when Mr. Campbell made these statements.

22. Mr. Campbell's comments were embarrassing to Ms. Alexander, hurt her feelings, affected her self-esteem, and caused her to lose sleep. She testified that she "never lived in a society of racism," and the situation reminded her of her "mom back in the days." (Id at 81).

23. Ms. Alexander quit her employment in January 2013. She now works as a cashier at a Wendy's restaurant.

## C.

24. Ms. D. Akridge sought employment at the Franklin La Quinta Inn at the suggestion of her sister, C. Akridge, and her mother, Ms. Goodner, who put in a good word for her with Ms. Atkins. After Ms. D. Akridge called several times and was told there were no positions then available, she was called by her mother sometime in September 2012, and told to come to the hotel.

25. After speaking with Ms. Atkins (and perhaps Mr. Campbell), Ms. D. Akridge was put to work on September 14, 2012, and filled out the application later that evening. She did not, however, indicate on her application form that she had a prior conviction for being in possession of cocaine in a school zone.

26. Ms. D. Akridge credibly testified that Mr. Campbell made improper remarks about every other day. Specifically, she claims Mr. Campbell made the following comments or took the following actions:

(A) He sometimes allowed white housekeepers to have snacks that were for the guest, but did not allow the black housekeepers the same privilege, and on two occasions allowed the Caucasian housekeepers (but not the African American housekeepers) bottled water.

(B) He said that President Obama should not be in the White House, that he should

go back to Africa, and that there should be no black president[9];

(C) He told Ms. C. Akridge that she must have been sitting next to a white girl when she took the CNA test;[10]

(D) He specified which doors the black housekeepers could use to come and go, but allowed the white housekeepers to use whatever door they wished;

(E) He referred to the first of the month as "Mother's Day" or "Black Mother's Day";

(F) He did not want the housekeepers to bring chitlins to the holiday party[11];

(Id. at 119-124 & 145).

27. On one occasion, Ms. D. Akridge complained to Mr. Campbell about what she perceived to be unequal treatment in housekeeper's room assignments. Mr. Campbell told her that if she did not like it she could quit. After that, she did not complain to him, fearful that she would lose her job.

28. Mr. Campbell's comments made Ms. D. Akridge "feel down" and "humiliated," and lowered her self-esteem.

29. Multiple times, D. Akridge complained about Mr. Campbell's comments to Ms. Atkins, and she was with her mother when Ms. Goodner called the 1-800 hotline number.

30. Ms. D. Akridge left her employment between the middle and end of November 2012.

**D.**

---

[9] Like Ms. Atkins, D. Ackridge was extremely proud when President Obama was elected because it showed that "America ha[d] grown," and that "we [as a people] invite everybody in from every different country." (Id. at 120).

[10] Ms. Goodner placed the conversation in the laundry room area, while Ms. D. Akridge testified that it occurred in the lobby. The Court finds this difference immaterial and that the comment was made.

[11] She testified that the comment was made "around Thanksgiving," while Ms. Alexander said the comment was made in relation to the Christmas party. Again (and assuming the comment was only made once), the Court finds the difference in recollection insignificant.

31.  In May 2011, Ms. C. Akridge, who had received a referral from the unemployment office, was interviewed by Ms. Atkins for a housekeeper position at the Franklin La Quinta Inn. Shortly thereafter, Ms. Atkins called to inform her that she was hired.

32.  For most of the time during her employment, Ms. C. Akridge worked on the first floor and, as a consequence, had a lot of contact with Mr. Campbell.

33.  Ms. C. Akridge credibly testified that Mr. Campbell made untoward comments or took discriminatory actions almost daily.   At trial, she testified that Mr Campbell:

(A) Refused to allow her to have bottled water or snacks, even though the Caucasian housekeepers were given those items, and told the black housekeepers that they could drink out of the water fountain or get something from the vending machine;

(B)  Allowed white housekeepers to get juice and fruit from the breakfast bar, but not the black housekeepers;

(C) Called her hair extensions "horse hair," which prompted the white employees to laugh, and told the black housekeepers that white women did not have to use horse hair because they "have natural human hair";

(D)  Required the housekeepers to exit particular doors so he could watch them because " black people steal stuff," and once posting a maintenance man at the back door to make sure that nothing was hidden in the trash;

(E) Asked her why she had a $100 bill when it was not "welfare day," after she asked him for change[12];

---

[12]  Ms. Goodner had given Ms. C. Akridge the $100 bill and told her to ask Mr. Campbell for some change so that they could buy some snacks.

(F) Stated that "he ought to get a busload full of Mexicans, and he just ought to get some more light in here because it's too many blacks," and that Mexicans and Indians clean rooms "better and faster than black housekeepers":

(G) Stated either in relation to the Thanksgiving or Christmas staff party that everyone was to bring a dish, so long as it was not chitlins and observed that is the only thing black people eat;

(H) Told her that she "must have sat by a white girl and cheated" when she informed him that she had earned her CNA certificate[13];

(I) Asked her why she needed cardboard boxes after she requested that the maintenance men not to crush them, saying, "you're just moving to another project";

(J) Commented that "the only thing that all black people get" is welfare when she asked him to fill out paperwork for childcare;

(K) Stated that "no black man should be in the White House," and that President Obama should have "stayed in Africa," observing that "[i]t's a 'white house,' not a 'black house.'"

(Id. at 164-174).

34. Ms. C. Akridge complained to Mr. Campbell about some of his comments and, particularly his questioning of her about having a $100 bill. However, "he was so used to saying stuff," and often asked her, "why don't you just quit?" (Id. at 167).

35. Ms. C. Akridge told her mother (Ms. Goodner) about the $100 bill incident. She also

---

[13] In mid- to late- November 2012, Ms. C. Akridge successfully completed a 90-day program for a CNA certificate. When Mr. Campbell made the comment about cheating, she stared at him for a moment, started to cry, told him his was wrong, and walked off.

reported the incident to Ms. Lee (who, as noted, became the head housekeeper after Ms. Atkins went part-time), and later told Ms. Amour about it.

36. The comment about the horse hair made Ms. C. Akridge feel "really bad," as did the statement about her cheating. The latter statement was particularly hurtful and embarrassing because Ms. C. Akridge was trying to better herself. She also felt that "she wasn't respected as a woman, as a single black mother," and was "humiliated and embarrassed." She lost sleep as a result of thinking about the comments and the situation at work. (Id. at 175).

37. Ms. C. Akridge last worked as a CNA, but is now a stay-at-home mom.

### E.

38. Ms. Goodner is the mother of D. Akridge and C. Akridge, from whom she learned about an opening at the Franklin La Quinta. Prior to going to work at that hotel, Ms. Goodner worked at the La Quinta on Sidco Drive, and then traveled and worked as a caretaker for a couple that painted La Quinta hotels.

39. Ms. Goodner was interviewed by Ms. Atkins. However, because Ms. Goodner had previously worked for La Quinta, Mr. Campbell had to get approval from corporate to hire her.

40. Ms. Goodner applied for a housekeeping position, but was placed in the laundry. Ms. Atkins was her supervisor.

41. On her application for employment, Ms. Goodner checked "no" in response to the question of whether she had any criminal convictions. This was false, as she has an extensive criminal record, including convictions for food stamp fraud, criminal impersonation, escape from a penal institution, use of stolen license plates, theft, driving on a suspended license, resisting arrest, and possession of drug paraphernalia.

42. The housekeepers started their day by congregating in the laundry where they would load up their carts with supplies. When addressing the housekeepers collectively, Mr. Campbell usually did so in the laundry room.

43. Mr. Campbell made what Ms. Goodner considered to be racists comments two to three times a week. That tapered off, however, after complaints had been made with the EEOC. Specifically, Ms. Goodner testified, that during her employment, Mr. Campbell made the following offensive statements:

A. Said that he would like to slap Ms. Atkins black ass (which Ms. Goodner reported to Ms. Atkins);

B. Stated that black people are "ghetto" and live in the projects;

C. Observed that some of the black housekeepers "called out" on the first of the month, probably because it was Mother's Day and they had received their welfare benefits;

D. Told Ms. Atkins that President Obama needed to "go back to where he come from," that is, Africa;

E. Stated that he did not want the black women working in the breakfast area;

F. Said that black people "steal," watched the employees leave, and had the maintenance man check the trash.

(Docket No. 82, Tr. Trans. Vo1. II at 14-17).

44. Ms. Goodner complained to Ms. Atkins about Mr. Campbell's offensive comments.

45. At one point, while in the laundry room, Ms. Goodner told Mr. Campbell that what he was saying about the black housekeepers was wrong, and that she "was going to call on him." (<u>Id</u>.

at 20). Mr. Campbell then pointed to the sign on the wall and told her to call the 1-800 number. On another occasion, Mr. Campbell told Ms. Goodner that if she was not happy she should just quit. On still a third occasion, after Mr. Campbell and Ms. Goodner argued, Ms. Goodner began to cry, went to a guest room where she was followed by Ms. Amour, told Ms. Amour about some of Mr. Campbell's comments, and said he was a "racist." Ms. Amour said that she would talk to Mr. Campbell, but did not.

46. Ms. Campbell's comments upset Ms. Goodner. She was hurt by his statements regarding the President, and hurt when she learned what he said about her daughter cheating on the CNA test.

47. In early December 2012, Ms. Goodner called the 1-800 hotline and left a message asking to speak to "Stacy or Jay" as soon as possible. She also called Ms. Babl's number who returned the call several days thereafter and left a message.

48. Also in December 2012, Ms. Goodner went to the Equal Employment Opportunity Commission and pick up several Charges which she brought back to the hotel.[14] During a break, Plaintiffs filled out the forms in a guest room, and the Charges were filed with the Tennessee Human Rights Commission on December 7, 2012. None of the Charges submitted in evidence specifically contain allegations of racially harassment, although two of the forms are missing pages.

49. Ms. Goodner left the Franklin La Quinta to work at another La Quinta. However, she was fired from that position for lying on her application after her deposition was taken in this case. She now works as the Assistant Lead in the dietary department at Life Care of Old Hickory.

**F.**

---

[14] Ms. Goodner had previously filed discrimination charges against prior employers.

50. Mr. Campbell was the General Manager of the Franklin La Quinta from May 2011 until July 2013. His supervisor was Mr. Wolfe.

51. At trial, Mr. Campbell flatly denied making any racially offensive comments or statements and claimed that "never had any problem at all" with Plaintiffs, or any of his other employees. (Id. at 81). He also stated that he joked with all of his employees, but none of the jokes was racial in nature. Mr. Campbell further testified that no one ever complained to him about any racial comments or harassment at the Franklin La Quinta, flatly denied making the racist comments and statements attributed to him by Plaintiffs, and claimed that he "never made a racial comment at any time when I've been working in a hotel or anywhere else." (Id. at 94).

52. Mr. Campbell conceded only that he (A) once told Ms. Alexander to drink out of the water fountain because they were busy at the front desk (and had told white employees, too, to drink from the fountain); (B) "joked" with Ms. C. Akridge about cheating on the CNA exam (but did not attribute it to race); (C) said he would like to "slap" Ms. Atkins out of frustration (but said nothing about her "black ass") and later apologized to her; (D) may have asked one of the "girls" if a hundred dollar bill was real (and would have asked a white employee the same thing since not a lot of hundred dollar bills are seen in a hotel); (E) may have asked a housekeeper about their hair if it had changed (but never made a derogatory comment about it, or mentioned horse hair or weaves); and (F) simply stated that he did not eat chitlins.

53. Mr. Campbell also testified that the head housekeeper could not hire or fire, and that all such decisions were make by him, although he conceded that each of the Plaintiffs was interviewed for a housekeeping position by Ms. Atkins.

54. The Court did not find Mr. Campbell to be a credible witness, and rejects his blanket

denial that he never made any racially offensive remarks. To the contrary, the Court found each of the Plaintiff's testimony to be credible and finds that racially offensive comments were made frequently and on a regular basis at the Franklin La Quinta Inn during the relevant times. While some of the comments may have been jokingly made, they were not accepted as such by Plaintiffs.

55. The Court further finds that, while Ms. Atkins may not have technically had the authority to hire and fire, Plaintiffs believed she had that authority, and Ms. Atkins exercised that authority in practice.

## G.

56. Ms. Armour began working at the Franklin La Quinta Inn in June 2012, having previously worked as the manager of a Extended Stay America hotel. During the relevant period, she split her time as an Assistant Manager between the Sidco Drive and Franklin La Quinta hotels.

57. After being hired by Defendant, Ms. Armour received "hands-on training" in Austin, Texas which including training on what to do after receiving a discrimination complaint. Pursuant to that training, Ms. Armour was to report complaints to the General Manager, unless the complaint was about the General Manager, in which case a report was to be made to the Regional Vice President.

58. Ms. Armour claims that she never heard Mr. Campbell make any racial jokes, racially derogatory marks, or racial slurs. More specifically, she denies ever hearing Mr. Campbell make derogatory remarks about (A) President Obama; (B) anyone's hair; (C) Mother's day; (D) welfare; or (E) chitlins. Ms. Armour also specifically denied that Ms. Atkins complained about Mr. Campbell calling the black housekeepers monkeys, or that Ms. Goodner told her that Mr. Campbell was a racist, and claims that she never saw Ms. Goodner cry.

59. Ms. Armour's blanket denials were no more believable than Mr. Campbell's. She was particularly unbelievable when she denied (or claimed not to remember) Ms. Goodner crying and telling her that Mr. Campbell was a "racist," even though that event was memorialized in Ms. Babl's notes.

**H.**

60. Ms. Staci Babl began her employment with La Quinta in September 2002 as a Field Human Resources Manager, with her primary role being to "receiv[e] employee concerns and investigate them." (Id. at 131). Her responsibilities encompassed six regions, containing approximately 150 hotels. She has a PHR ("Professional in Human Resources) certification which she received by taking a weekend online course and passing a test, and received some on-the-job training

61. Each employee receives a handbook upon beginning there employment which contains the anti-harassment policy. That policy provides:

> La Quinta is committed to providing a work environment where employees are treated with courtesy, respect and dignity. Accordingly, La Quinta does not tolerate any form of discrimination, harassment, retaliation, joking remarks or other abusive conduct by or against employees, contractors, clients, guests, candidates, vendors, third parties or any other individuals who conduct business with La Quinta because of their race, color, sex, religion, national origin, age, disability, sexual orientation, marital status, citizenship status, veteran status, or any other category protected by law, or because an individual complained of harassment or discrimination.

(Def. Ex. 12).

62. According to Ms. Babl, employees with a complaint have "several avenues . . . [t]hey can contact one of their managers, general manager, assistant general manager," call the 1-800 helpline number, or contact her using the number found on a poster that is posted near the time

clock.[15] (Id. at 132). According to her, head housekeepers are not managers, do not have the ability to hire or fire, and are not the proper individuals to complain to about harassment.

63. Ms. Babl testified that the 1-800 number is a voice mailbox. Each morning an employee at the corporate office listens to the voice mail, but Ms. Babl has no personal knowledge as to whether the employees are instructed to log everything that is said. According to practice, the employee then passes the information on to the correct field human resources manager, either from the employee's indication of which hotel is involved, or by the caller's area code. The regional human resources representative is then supposed to make contact with the complaining employee. Once logged, the voicemails are deleted.

64. Ms. Babl claims to have first learned about employment problems at the Franklin La Quinta Inn in early December 2012. As noted previously, on December 5, 2012, Ms. Goodner left a voice mail requesting that either she or Mr. Jay call her as soon as possible, and Ms. Babl received that message a couple days later. Ms. Babl returned Ms. Goodner's call on December 11, but received only voicemail and left a message. Ms. Babl does not recall receiving any other messages from any of the Plaintiffs via the hotline.[16]

65. Ms. Babl traveled to the Franklin La Quinta and conducted interviews on January 10, 2013. She testified that she understood the complaint to be that white housekeepers were required to clean fewer rooms than the black housekeepers, and that white housekeepers were allowed to work more hours.

66. Ms. Babl interviewed Mr. Campbell, Ms. Armour, two of the Plaintiff (Ms. Goodner and

---

[15] The poster listed the telephone numbers for Mr. Campbell, Mr. Wolfe, and Ms. Babl.

[16] She recalled receiving one call in her office from Ms. Atkins in February 2013, and another from Ms. C. Akridge in March of that year. Both calls had to do with question about pay.

Ms. C. Akridge), and a few other housekeepers at the hotel. A couple of weeks later, on February 9, she interviewed Ms. Atkins by phone.[17]

67. When Ms. Babl interviews an employee, she writes down the answers to the questions she asks. She then goes over the complaint with the employee to ensure that the notes are complete. However, Ms. Babl did not take notes of her interview with Mr. Campbell (though he claims that she did), and the notes she took regarding her interview of the housekeepers and Ms. Armour are of limited help because the questions to which the answers pertain are not recorded in her notes. Thus, statements like "Jeff has a weird sense of humor" and her observation that "I imagine he was joking" could be pertinent, but there is no way of knowing in the absence of context.

68. Ms. Babl claim that neither Ms. Goodner, Ms. C. Akridge, or Ms. Atkins told her that Mr. Campbell was a racist, nor did they mention racial harassment. She further claims that none of the other housekeepers she interviewed (white or black) mentioned racial harassment or a hostile work environment.

69. Ms. Babl concluded that there was "no evidence that there were any differences in what was being assigned in terms of rooms, room assignments, and hours worked." (Id. at 153).

70. Ms. Babl testified that the first time she heard allegations about racial harassment was after this suit was filed, which precipitated another trip to the Franklin La Quinta. However, in her January 10, 2013 interview notes for Ms. Armour, Ms. Babl wrote that Ms. Armour reported that (1) Ms. Goodner and Mr. Campbell had argued; (2) Ms. Goodner went to a room at the hotel and was crying; and (3) Ms. Goodner accused Mr. Campbell of being a racist. Ms. Babl took that to mean racism in room assignments, and did not bother to follow up by asking Ms. Armour what the

---

[17] By this time, Ms. D. Akridge and Ms. Alexander had left La Quinta's employment.

statement was in reference to, nor did she follow-up on Ms. Goodner's statement that Ms. Armour said that Mr. Campbell "needs to stop doing this." (Id. at 162). Ms. Babl conceded that if Ms. Armour learned of the details surrounding Ms. Goodner's claim that Mr. Campbell was a racist, it was incumbent on Ms. Armour to report it to her.

71. Ms. Babl now works for as the Manager of Human Resources for the Elmbrook School District in Brookfield, Massachusetts, having left La Quinta shortly before the trial in this case.

### I.

72. On the ultimate issue of credibility, the Court finds that Plaintiffs were credible; Mr. Campbell and Ms. Armour were not. The Court finds that Mr. Campbell made racial statements and comments on a regular basis, that most Plaintiffs directly complained to him about his comments, that one or more of the Plaintiffs complained to Ms. Armour who herself witnessed several incidents, and that one or more of the Plaintiff's called the corporate hotline to air their complaints about racial harassment.

73. In making that assessment, the Court has considered the absence of specific allegation of racial harassment in the discrimination charges, Ms. Babl's claim that neither of the Plaintiff's she interviewed in person complained about racial harassment, and that some of the allegations Plaintiff's made at trial were not testified to in their depositions. However, as the Court pointed out at the close of Plaintiff's case, "objectively, the story rings true to [the Court], not on all the details, but the core of this seems pretty doggone believable." (Id. at 77). Having had the opportunity to consider the arguments raised by the parties regarding credibility, the Court confirms those observations.

74. In assessing credibility, the Court has also considered that hearing Plaintiffs' testimony

was, in some respects, to quote the recently departed Yogi Berra, like "*deja vu* all over again" in the sense that each Plaintiff's testimony mirrored the other's. However, and contrary to Defendant's suggestion, this does not mean that the events were fabricated out of whole cloth. Rather, and again having had the opportunity to see and hear each Plaintiff testify, the Court attributes the similarity in large part to the fact that each Plaintiff worked in an environment where inappropriate remarks regarding race were made on a near daily basis.

## II. Conclusions of Law

### A. Liability

The THRA was enacted to "[s]afeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age or national origin in connection with employment," and to "[p]rotect their interest in personal dignity and freedom from humiliation[.]" Tenn. Code Ann. § 4-21-101(a)(2) & (a)(3).[18] Because "[t]he intent of the THRA is to provide for execution within Tennessee of the policies embodied in the federal civil rights statutes," Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006), "THRA claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases).

"The touchstone of any hostile work environment claim . . . is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Khamati v. Sec'y of Dep't of the Treasury 557 F. App'x 434, 442-43 (6th Cir. 2014)

---

[18] This Court's ruling on Defendant's Motion for Summary Judgment set forth in detail the law applicable to Plaintiffs' remaining hostile work environment claim. Since Tennessee substantive law on this issue has not changed in the interim, the Court finds it unnecessary to reinvent the wheel and will rely to some extent on the analytical framework set forth in that prior ruling.

(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances."  Williams v. Gen. Motors, 187 F.3d 553, 562 (6th Cir. 1999).

The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive."  Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).  "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Clark v. United Parcel Serv., Inc., 400 F.3d 341, 352 (6th Cir. 2005) (quoting, Harris 510 U.S. at 23).

Still, the inquiry into whether a working environment is hostile is not subject to a "mathematically precise test," Harris, 510 U.S. at 22, and there is no bright line "'between a merely unpleasant working environment . . . and a hostile or deeply repugnant one,'" McPherson v. City of Waukegan, 379 F.3d 430, 438 (7th Cir. 2004) (citation omitted).  Moreover,  a working environment need not be "hellish" to establish a claim; "something short of the Ninth Ring" may violate anti-harassment statutes.  Jackson v. Cnty. of Racine, 474 F.3d 493, 500 (7th Cir. 2007).  As the Supreme Court has stated:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown.  A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.  Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

<u>Harris</u>, 510 U.S. at 21. <u>See</u> <u>also</u> <u>Williams v. CSX Transp. Co., Inc.</u>, 533 F. App'x 637, 641 (6th Cir. 2013.

From a subjective standpoint, the employment environment the Franklin La Quinta was hostile and abusive. Each Plaintiff testified that it was, and their testimony was credible.

The environment was also hostile or abusive from an objective standpoint. The preponderance of the evidence shows that, at a minimum, Mr. Campbell made racially offensive comments or statements and/or took actions based on race several times a week. While some of the comments may have been misguided attempts at humor, others were downright offensive, and all were unwelcome. <u>See</u>, <u>Williams v. CSX Transp. Co.</u>, 533 Fed. App'x 637, 641 (6th Cir. 2013) ("Conduct need not be both severe and pervasive to constitute a hostile environment, but may be either sufficiently severe or sufficiently pervasive"); <u>Walker v. Mod-U-Kraft Homes, LLC</u>, 775 F.3d 202, 209 (4th Cir. 2014) (noting that "'severe or pervasive' prong is not answered by a 'mathematically precise test,'" and stating that "alleged environment consisted of comments of varying degrees of offensiveness being made to [plaintiff] several times a week for well over a year" may be objectively severe); <u>Ellis v. Houston</u>, 742 F.3d 307, 320 (8th Cir. 2014) ("racist remarks on a near daily basis" can meet objective prong of hostile work environment claim); <u>Lyle v. The Cato Corp.</u>, 730 F. Supp.2d 768, 779 (M.D. Tenn. 2010) (observing that a court must consider "the work environment as a whole" and concluding that "offensive and pejorative comments about African Americans made by Plaintiff's supervisors [that] allegedly occurred several times a week" could amount to a hostile work environment).

To be sure, not every Plaintiff heard every statement or was present when all the untoward comments were made. However, the Sixth Circuit has "rejected the 'extremely narrow view of

workplace harassment . . . in which every single member of a protected class would have to suffer a series of affronts both explicitly racial and personal in nature before she could claim the existence of a hostile work environment.'" Armstrong v. Whirlpool Corp., 363 Fed. App'x 317, 325 (6th Cir. 2010) (quoting Jackson v. Quanex, 191 F.3d 647, 658, 659-60 (6th Cir. 1999)). Rather, "Sixth Circuit caselaw addressing other-act evidence . . . makes clear that [a court] may consider evidence of other acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 335 (6th Cir. 2008). After all, "consideration of offensive acts solely directed at the plaintiff in isolation from other acts that occur in the workplace would 'defeat the entire purpose of allowing claims based upon a hostile work environment theory, as the very meaning of environment is [t]he surrounding conditions, influences or forces which influence or modify.'" Id. (quoting, Jackson, 191 F.3d at 661).

Here, the preponderance of the evidence shows that a reasonable person in the Plaintiffs' position would have found the work environment hostile. On a regular basis, each Plaintiff was subjected to offensive remarks or comments, and they learned of similar racially tinged remarks from their co-workers.

This does not end the inquiry because the Tennessee Supreme Court has specifically held that the Faragher-Ellerth defense applies to hostile work environment claims under the THRA. Parker v. Warren Cnty. Util. Dist., 2 S.W.3d 170, 176 (Tenn. 1999). This defense, based upon Burlington Industries Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), provides that employers are not automatically liable for harassment perpetuated by their employees, with the parameters of the defense defined by whether the alleged harasser is

a co-worker or a supervisor.

Where, as here, the harassment is attributed to a supervisor and there is no tangible adverse employment action, the employer is liable for a hostile work environment created by that supervisor unless it shows that it (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Ellerth, 524 U.S. at 765. This is an affirmative defense which Defendant must prove by a preponderance of the evidence. Faragher, 524 U.S. 807.

Defendant asserts that it has met both prongs of the Faragher/Ellerth defense. As for the first prong, it points to (1) the Policy Prohibiting Harassment as set forth in the Employee Handbook which states that "Employees who feel they have been subjected to such prohibited conduct, whether involving fellow employees, supervisors, guests or other third parties, must report it to their **General Manager, the Human Resources Department or the LQ HelpLine (1-866-548-6071)** as soon as possible after the occurrence," and (2) the "[t]he HelpLine poster [which] provides the telephone numbers of the **General Manager, the Human Resources Manager and the Regional Vice-President**, as well as the LQ HelpLine, and identifies these individuals as those whom employees should report workrelated concerns." (Docket No. 86 at 34, emphasis by Defendant). Since Mr. Campbell was the alleged harasser and the only other person on either list who was contacted was Ms. Babl, and since she traveled to the Franklin hotel after Ms. Goodner called, Defendant argues that it had an effective policy which Plaintiffs did not utilize.

Defendant's focus on the General Manager, the Human Resources Manager, and the Regional Vice-President is too narrow, both under the law and under the facts in this case.

"Generally, an employer satisfies the first part of the <u>Faragher</u>/<u>Ellerth</u> two-part standard when it has promulgated and enforced a . . . harassment policy." <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 275 (6th Cir. 2009). However, and "[r]egardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." <u>Clark v. United Parcel Serv.</u>, 400 F.3d 341, 350 (6th Cir. 2005).

Even ignoring Ms. Atkins' and Ms. Alexander's credible testimony that their calls to the hotline went unanswered, this Court has found that each of the Plaintiffs complained to Ms. Atkins who, in turn, complained to Ms. Armour, as did Ms. Goodner, the latter of which was confirmed by Ms. Babl's interview notes. To the extent Defendant takes the position that complaining to Ms. Armour was not enough (and forgetting that the preponderance of the evidence shows that Ms. Armour was present when some of the inappropriate remarks were made), then its policy was ineffective[19] because "'an effective harassment policy should at least: (1) require supervisors to report incidents of . . . harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.'" <u>Id.</u> (citation omitted).

Moreover, Defendant's own hotline poster instructed employees:

TELL SOMEONE: Speak to your manager. If your concern was not resolved or your manager is the issue, contact your RVP, another manager or Human Resources

(Def. Ex. 11). As Assistant General Manager, Ms. Armour was indisputably "another manager."

---

[19] In ruling on Defendant's Motion for Summary Judgment, the Court stated that it had "little trouble concluding that Defendant has met the first prong of the <u>Faragher</u>/<u>Ellerth</u> defense" because "La Quinta has an anti-harassment policy that Plaintiffs do not challenge." (Docket No. 60 at 14-15). However, at that time, the Court did not understand Defendants to be suggesting that reporting to an Assistant Manager was insufficient and, apparently, neither did Plaintiffs.

In fact, both she and Ms. Babl confirmed at trial that, as an assistant manager, Ms. Armour had a duty to report any harassing conduct and report complaints about such conduct.

Given the language in the hotline poster, and given Defendant's employee's own understanding of the policy, it can hardly be said that Plaintiffs' unreasonably failed to take advantage Defendant's anti-harassment policy. See, Gallagher, 567 F.3d 277 ("An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized – or is reasonably believed by a complaining employee to have been authorized – to receive and respond to or forward such complaints to management."). Defendant has not proven its entitlement to the Ellerth/Faragher defense by a preponderance of the evidence.

## B. Damages

"The THRA provides broad remedies to prevailing parties, including reinstatement, damages for humiliation and embarrassment, reasonable attorney's fees, and costs of litigation." Sneed v. City of Red Bank, 459 S.W.3d 17, 28 (Tenn. 2014) (citing Tenn. Code Ann. § 4–21–311(b)). Here, Plaintiffs seek damages in "the range of" $250,000 to $350,000 each for "anger, frustration, embarrassment, humiliation, and emotional pain." (Docket No. 88 at 50).

In support of their request, Plaintiffs rely on Lilley v. BTM Corp., 958 F.2d 746 (6th Cir. 1992), Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469 (6th Cir. 2005), Miller v. Alldata Corp., 14 Fed. App'x 457 (6th Cir. 2011) and Bailey v. USF Holland, Inc., 526 F.3d 880 (6th Cir. 2008), all Sixth Circuit decisions that upheld awards within the range sought by Plaintiffs. This Court has read and considered each of those cases and does not find them particularly helpful. All, save Bailey, involved allegedly wrongful terminations, and affirmed awards with little discussion other than stating that the awards were within the realm of that awarded in comparable cases.

Bailey, involved "a wide variety of racially motivated harassment," by numerous actors, some of "which was both serious and potentially dangerous," and included the spraying of racist graffiti and the hanging of nooses on company premises. The offensive conduct lasted six years, and despite sensitivity training and the fact that Plaintiffs "spent years complaining" the statements and conduct continued.

Not to denigrate what occurred at the Franklin La Quinta, the conduct and the statement here pale in comparison those in Bailey. And, unlike Bailey, the conduct and statements did not extend over years and involved only one actor.

Compensatory damages are "intended to make a plaintiff whole [and] compensate the plaintiff for damage or injury caused by a defendant's wrongful conduct." Meals ex rel. Meals v. Ford Motor Co., 417 S.W.3d 414, 419 (Tenn. 2013). Such damages need not be calculated with "'mathematical precision,'" but "must . . . be proven with reasonable certainty." Memphis Light, Gas & Water Div. v. Starkey, 244 S.W.3d 344, 354 (Tenn. Ct. App. 2007).

The Court's goal is "to make a fair and reasonable assessment of damages," Riad v. Erie Ins. Exchange, 436 S.W.3d 26, 275 (Tenn. Ct. App. 2013), not to provide a "windfall," Shelby Cnty. Health Care Corp. v. Baumgartner, 2011 WL 303249, at *17 (Tenn. Ct. App. 2011). Moreover, "compensatory damages require individual determinations." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 887-88 (9th Cir. 2011); see, In re Urethane Antitrust Lit., 786 F.3d 1245, 1259 (10th Cir. 2014" (Noting "necessity of individual determinations on damages"); In re Whirlpool Corp., 722 F.3d 838, 845 (6th Cir. 2013) (affirming certification of class where "[p]roof of damages [was] reserved for individual determination).

Here, the Court finds that a just and reasonable award for each Plaintiff should be based

primarily upon the length of time that each worked at the Franklin La Quinta and that statements and conduct that each was subjected to. The Court finds the following to be proper compensation:

(A) Ms. Atkins, who worked as head housekeeper, had the most contact with Mr. Campbell, and was the recipient of frequent complaints from the other housekeepers is entitled to $20,000.00.

(B) Ms. C. Akridge who worked on the first floor in proximity to Mr. Campbell, was employed at the hotel longer than the others, and who was the subject of several of Mr. Campbell's comments is entitled to $17,500.00.

(C) Ms. Goodner, who worked at the hotel for approximately 8 months before the THRC Charges were filed is entitled $10,000.00.

(D). Ms. Alexander who worked for 7 months at the hotel is entitled to $7,500.00; and

(E) Ms. D. Akridge, who worked at the hotel for 2 months is entitled to $2,500.00.

In addition to compensatory damages, Plaintiffs are entitled to recover reasonable attorney's fees under the THRA. Tenn. Code Ann. § 4-21-311. However, the Court will defer ruling on the amount of appropriate fees until such time as any appeal has been completed, or the time for taking an appeal has expired and Plaintiffs have filed a Motion for Attorney's Fees in compliance with Local Rule 54.01.

### III.  CONCLUSION

On the basis of the foregoing, the Court finds liability in favor of each Plaintiff and against Defendant.  The Court also finds that each Plaintiff is entitled to compensatory damages.  An Order will be entered confirming these findings and conclusions.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE